**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

**MELISSA WHEELER**,

    Plaintiff,

v.

**AMAZON WEB SERVICES, INC**.,

    Defendant.

**Civ. Action No. 4:22-cv-00370**

Judge Andrew Hanen

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Dated: November 9, , 2023

Respectfully Submitted by:

*/s/ Lisa Ventress*
Lisa Ventress
Federal Bar No.  3471199
Texas SBN 24076751
1322 Space Park Dr. Ste C222
Houston, TX 77058
Telephone: (832) 240-4365
Facsimile: (832) 565-1752
Email: lisa@theventressfirm.com

**ATTORNEY FOR PLAINTIFF**

**TABLE OF CONTENTS**

SUMMARY OF THE ARGUMENT......................................................................................1

NATURE AND STAGE OF THE PROCEEDING ...........................................................2

STATEMENT OF MATERIAL FACTS .........................................................................2

STATEMENT OF ISSUES.............................................................................................6

LEGAL STANDARD.....................................................................................................7

ARGUMENT..................................................................................................................7

I.      PLAINTIFF'S RETALIATION CLAIM MUST BE DECIDED BY A JURY..................8

     A.    The Materially Adverse Actions to Which Defendant Subjected Plaintiff are Causally Connection to Her Protected Activity....................................................8

         1.    Close Temporal Proximity Establishes Causal Connection........................8

         2.    Elkon was Not the Sole Decision maker ...................................................10

         3.    Elkon was Aware of Protected Activity Before the Adverse Actions........12

         4.    Other Evidence Demonstrating Causal Connection .................................14

     B.    Defendant's Explanation is Unworthy of Credence and Plaintiff Provides Substantial Evidence of Pretext....................................................................15

         1.    Defendant's Explanation is Unworthy of Credence .................................15

         2.    Plaintiff Adduces Substantial Evidence of Pretext ..................................19

             i.    Defendant deviated from its normal policies.............................19

             ii.    Defendant took actions to ensure Plaintiff could not pass Pivot ...20

             iii.    Inconsistent, false, or shifting explanations.................................20

              iv.    Suspicious statements that bear directly on Defendant's intent ....21

             v.    Prolonged campaign of day-to-day mistreatment.........................22

             vi.    Temporal Proximity .....................................................................22

II.     PLAINTIFF'S DISPARATE TREATMENT CLAIMS MUST REACH A JURY ...........22

     A.    Plaintiff's Evidence Establishes a Prima facie Case of Disparate Treatment based on Age, Race, and National Origin............................................................23

         1.    Plaintiff Establishes the Adverse Action Element ....................................23

         2.    Plaintiff Suffered Adverse Actions Because of Her Protected Classes .....24

     B.    Defendant's Legitimate Non-Discriminatory Reason is Unworthy of Credence and Plaintiff Adduces Substantial Evidence of Pretext ...............................29

     C.    Motivating Factor ......................................................................................29

CONCLUSION ............................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................................7

*Berry v. Sheriff's Office Ouachita Par.*,
No. 20-30243 (5th Cir. Oct 26, 2020). ...........................................................10, 19

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., L.P.*,
482 F.3d 408 (5th Cir. 2007)...................................................................................20

*Burton v. Freescale Semiconductor, Inc.*,
798 F.3d 222 (5th Cir. 2015)...................................................................................17

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................................7

*Dehart v. Baker Hughes*,
214 F. App'x 437 (5th Cir. 2007) ............................................................................14

*Desert Palace, Inc. v. Costa*,
539 U.S. 90 (2003) ..................................................................................................30

*Evans v. Houston*,
246 F.3d 344 (5th Cir. 2001)....................................................................................8

*Fabela v. Socorro Independent School Dist*,
329 F.3d 409 (5th Cir. 2003)...................................................................................22

*Furnco Construction Corp. v. Waters*,
438 U.S. 567 (1978) ................................................................................................25

*Garcia v. Pro. Cont. Servs.*, Inc.,
938 F.3d 236 (5th Cir. 2019)....................................................................................8

*Gee v. Principi*,
289 F.3d 342 (5th Cir. 2002)...................................................................................20

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009) ................................................................................................30

*Hamilton v. Dallas Cnty.*,
79 F.4th 494 (5th Cir. 2023) ...................................................................................23

*Hayden v. First National Bank*,
595 F.2d 994 (5th Cir. 1979)....................................................................................8

*Jenkins v. Orkin Exterminating Co., Inc.*,
646 F. Supp. 1274 (E.D. Tex. 1986) .......................................................................14

*Jensen-Graf v. Chesapeaker Employers' Ins. Co.*,
616 Fed.Appx. 596 (4th Cir. 2015).........................................................................24

*Johnson v. Halstead*,
916 F.3d 410 (5th Cir. 2019)...................................................................................10

*Johnson v. Uncle Ben's, Inc.*,
657 F.2d 750 (5th Cir. 1981)...................................................................................24

*Klebe v. Univ. of Texas Health Sci. Ctr. at San Antonio*,

No. 10-50458 at 2 (5th Cir. Nov 17, 2011).................................................................13, 22

*Lee v. Kansas,*
    574 F.3d 253 (5th Cir. 2009)...............................................................................28

*Lemonia v. Westlake Mgmt. Servs.,*
    22-30630 (5th Cir. Oct 18, 2023) .........................................................................9

*Long v. Eastfield College,*
    88 F.3d 300 (5th Cir. 1996)..............................................................................8, 14

*Manning v. Chevron Chemical Co., LLC,*
    332 F.3d 874 (5th Cir. 2003)................................................................................30

*McMichael v. Transocean Offshore Deepwater Drilling, Inc.,*
    934 F.3d 447 (5th Cir. 2019)................................................................................19

*McMillan v. Rust College, Inc.,*
    710 F.2d 1112 (5th Cir. 1983)...............................................................................8

*Medina v. Ramsey Steel Co.,*
    238 F.3d 674 (5th Cir. 2001)................................................................................8

*Mitchell v. Snow,*
    No. 08-20448 (5th Cir. Jun 17, 2009)...................................................................9

*Nowlin v. Resolution Trust Corp.,*
    33 F.3d 498 (5th Cir. 1994).................................................................................14

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) .............................................................................................25

*Parker v. State of La. Dep't of Educ. Special Sch. Dist.,*
    323 F. App'x 321 (5th Cir. 2009)....................................................................15, 18

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989) ...........................................................................................25

*Rachid v. Jack in the Box, Inc.,*
    376 F.3d 305 (5th Cir. 2004)...............................................................................22

*Ray v. Tandem Computs., Inc.,*
    63 F.3d 429 (5th Cir. 1995).................................................................................9

*Reed v. Neopost USA, Inc.,*
    701 F.3d 434 (5th Cir.2012)................................................................................30

*Reeves v. Sanderson Plumbing Prods.,* Inc.,
    530 U.S. 133 (2000) ......................................................................................18, 26

*Russell v. McKinney Hosp. Venture,*
    235 F.3d 219 (5th Cir. 2000)...............................................................................26

*Rutherford v. Harris County Texas,*
    197 F.3d 173 (5th Cir. 1999)...............................................................................28

*Simmons v. Camden County Bd. of Educ.,*
    757 F.2d 1187 (11th Cir. 1985).............................................................................8

*Sprint/United Mgmt. Co. v. Mendelsohn,*
    552 U.S. 379 (2008) ......................................................................................25, 28

*St. Mary's Honor Center v. Hicks,*

113 S.Ct. 2742 (1993)........................................................................................15

*Thornbrough v. Columbus and Greenville R. Co.*,
   760 F.2d 633 (5th Cir. 1985)......................................................7, 13, 25, 29

*Welsh v. Fort Bend Indep. Sch. Dist.*,
   941 F.3d 818 (5th Cir. 2019).....................................................................9

<u>Statutes</u>

29 C.F.R. § 1626.8(c) ....................................................................................30

42 U.S.C. §1981 ...............................................................................................2

Age Discrimination in Employment Act of 1967 .........................................2

Texas Commission on Human Rights Act...........................................2, 29, 30

Title VII of the Civil Rights Act of 1964.......................................................2

<u>Rules</u>

Fed. R. Civ. P. 56 .............................................................................................7

**APPENDIX OF EXHIBITS**

| | |
|---|---|
| Ex. A..............Wheeler Dep | Ex. Z..............AWS_Wheeler 000406-07 |
| Ex. B..............Knapp Dep | Ex. AA..............AWS_Wheeler 000410-11 |
| Ex. C..............Elkon Dep | Ex. BB..............AWS_Wheeler 000421-39 |
| Ex. D..............AWS_Wheeler 000123-25 | Ex. CC..............AWS_Wheeler 000440-43 |
| Ex. E..............AWS_Wheeler 000129-134 | Ex. DD..............AWS_Wheeler 000451 |
| Ex. G..............AWS_Wheeler 000193-200 | Ex. EE..............AWS_Wheeler 000453 |
| Ex. H..............AWS_Wheeler 000245-47 | Ex. FF..............AWS_Wheeler 000603-07 |
| Ex. I..............AWS_Wheeler 000248-51 | Ex. GG..............AWS_Wheeler 000619-20 |
| Ex. J..............AWS_Wheeler 000262-64 | Ex. HH..............AWS_Wheeler 000629 |
| Ex. K..............AWS_Wheeler 000269-71 | Ex. II..............AWS_Wheeler 000691-98 |
| Ex. L..............AWS_Wheeler 000272-73 | Ex. JJ..............AWS_Wheeler 000720-32 |
| Ex. M..............AWS_Wheeler 000274-76 | Ex. KK..............AWS_Wheeler 000636-37 |
| Ex. N..............AWS_Wheeler 000275 | Ex. LL..............AWS_Wheeler 000744 |
| Ex. O..............AWS_Wheeler 000280 | Ex. MM..............Elkon Decl. |
| Ex. P..............AWS_Wheeler 000281 | Ex. NN..............AWS_Wheeler 001103 |
| Ex. Q..............AWS_Wheeler 000285-93 | Ex. OO..............AWS_Wheeler 001176-79 |
| Ex. R..............AWS_Wheeler 000299 | Ex. PP… .........Wheeler Decl. |
| Ex. S..............AWS_Wheeler 000303-14 | Ex. QQ………….MWheeler 000001 |
| Ex. T..............AWS_Wheeler 000318-20 | Ex. RR………….MWheeler 000002 |
| Ex. U..............AWS_Wheeler 000321-23 | Ex. SS…………MWheeler 000003 |
| Ex. V..............AWS_Wheeler 000332 | Ex. TT……………Amanda H. Smith Depo |
| Ex. W..............AWS_Wheeler 000339-40 | Ex. UU……………Ivre Kladnik Depo |
| Ex. X..............AWS_Wheeler 000371 | Ex. VV………….. Laura Macdonald Depo |
| Ex. Y..............AWS_Wheeler 000401 | |

## SUMMARY OF THE ARGUMENT

Plaintiff responds herein to Defendant's Motion for Summary Judgment (the "Motion" or MSJ) on Plaintiff's retaliation and disparate treatment claims. Dkt. 24.

For the first three-plus years of Plaintiff's tenure at Defendant, she was considered a "highly valued" employee. She historically received excellent reviews from her peers, customers, and managers. She managed a workload in excess of her colleagues, was quickly promoted to Senior Recruiter, and had began working towards a management position at the end of 2019. Throughout this time, only briefly in 2019, had Plaintiff's performance ever remotely been questioned. In early-2019, Plaintiff's then-manager, Mellissa Eyeington, placed her in Focus, only to promptly remove her, noting Plaintiff did not just improve but she sustained her performance for months, "exceeding all expectations" and "raising the bar for her role." Eyeington recommended that Plaintiff once again be rated "highly valued." While Plaintiff had also been placed in Focus in 2018, it was not because of any performance problems. Rather, Plaintiff's then-manager, Crystal Serrato, placed several employees who were new to her team, including Plaintiff, in Focus as an experiment in employee development. Serrato noted: "I know the "dev list" has a negative connotation . . . You are doing fabulous and proved my theory[.]"

During her tenure at Defendant, however, Plaintiff experienced and observed discriminatory conduct about which she had serious concerns, including from her manager, Patricia Elkon, and her Skip-level manager, Kevin Knapp. Plaintiff's concerns reached a boiling point on March 20, 2020, when Knapp used offensive racial language to refer to one of Plaintiff's Hispanic colleagues. Plaintiff confronted Knapp about his comments, but he responded angrily, so she reported his comment (and her fear of retaliation) to human resources. From this point on, Plaintiff's experience at Defendant drastically changed. Defendant pulled out all the stops to ensure Plaintiff would  be punished for her complaints. Over the next three months, Plaintiff reported discrimination or retaliation no less than eight times. Defendant's response was without fail, to apply increasingly severe punitive pressure,

ultimately culminating in Plaintiff's termination. The parade of horrors that Defendant describes about Plaintiff's performance is misleading, at best. It conflicts with substantial evidence and is littered with objective inaccuracies, false and shifting assertions, deviations from standard policy, and other indicia from which a reasonable juror could determine that Defendant is trying to mask its discriminatory conduct.

## NATURE AND STAGE OF THE PROCEEDING

This is an employment discrimination case initiated on February 3, 2022, in which Plaintiff asserts claims for retaliation, race, national origin, and age discrimination pursuant to 42 U.S.C. §1981 (Sec. 1981); Title VII of the Civil Rights Act of 1964 (Title VII), the Texas Commission on Human Rights Act (TCHRA), and the Age Discrimination in Employment Act of 1967 (ADEA). Dkt. 1. Discovery closed on July 11, 2023. Dkt. 21. On October 12, 2023, Defendant moved for summary judgment. Dkt. 24. Trial is set for February 26, 2024. Dkt. 21.

## STATEMENT OF MATERIAL FACTS

1.  Plaintiff is a Hispanic female, who was over 40 years old throughout the relevant time period. Ex. KK, AWS_Wheeler 000636-37, Ex. PP, Wheeler Decl.  ¶2

2.  Plaintiff was hired by Defendant in 2016 as a Senior Recruiter and within a year, she was quailed for and offered an internal transfer to AWS, as Senior Recruiter, and then as a Senior Sourcing Recruiter. Ex. A, Wheeler Dep. at 25:18-26,25, 31:21-32:12, Ex. PP, Wheeler Decl.  ¶4-6

3.  Defendant employs various performance feedback, management, improvement, and rating tools, including Forte, Focus, Pivot, and OV Ratings. *See* MSJ at 3-5.

4.  Forte is a performance feedback tool that occurs at the end of the year, in which an employee's peers, customers, and supervisors provide feedback on the employee's strengths and weaknesses. *See* MSJ at 3; Ex. A, AWS_Wheeler 000123-25.

5.  Focus is a performance management tool in which an employee may be placed to facilitate improvement or monitoring of certain areas of an employee's performance. MSJ at 3.

6.  An employee has no knowledge they are in a Focus. Ex. C Elkon Dee at 85:6-7, 18-21, 112:16-18.

7.   An employee may be placed in Focus if they are underperforming or if they have moved to a new unit or department. Ex. A, Wheeler Dep. 70:8-22; Ex. V, AWS_Wheeler 000332.

8.  An employee's manager will work with the employee's Skip-level manager and human resource business partner (HRBP) to decide whether to place an employee in Focus, Ex. C, Elkon Dep. 105:5-07:4, set the duration of the Focus, and monitor progress. *Id.* 87:2-88:9.

9.      Defendant's standard procedure is to allow an employee between thirty to sixty (30-60) days in Focus to demonstrate improved performance. Ex. C, Elkon Dep. 86:15-87:1, 87:2-88:9.

10.     If an employee does not meet the performance goals outlined in the Focus, they may be placed into Pivot. *Id.* 85:2-21.

11.     Pivot is a performance improvement plan in which the employee is presented with written expectations on which they will be measured to demonstrate improved performance. Ex. JJ, AWS_Wheeler 000720-32.

12.     An employee's manager works with the Skip manager, HRBP, and other human resources personnel on material aspects of the Pivot, including but not limited to the decision to place an employee in Pivot, setting performance expectations, evaluating performance expectations, ensuring the process is conducted fairly, ensuring the appraisals are accurate, and ultimately approving Pivot related decisions. Ex. B, Knapp Dep. 48:25-49:5; 50:16-51:25; 55:9-20; 56:10-23, 53:5-20, 85:23-87:13, 111:10-12. Ex. C, Elkon Dep. 57:16-25. , 121:8-122:11.

13.     Defendant typically provides forty-five to sixty (45-60) days for an employee to demonstrate improvement in Pivot. Ex. C, Elkon Dep. 115:23-117:1.

14.     If an employee does not improve in Pivot, they can be terminated. *See* Ex. JJ, AWS_Wheeler 000720-32.

15.     Defendant conducts performance ratings (OV ratings) at the end of the year. Ex. B, Knapp Dep. at 27:9-19.

16.     An employee's direct manager works with the Skip-level manager, dept. manager, the Human Resource Business Partner (HRBP), and other human resources personnel in determining what rating an employee receives. Ex. C, Elkon Dep. 121:8-122:11.

17.     If an employee receives a LE "least effective" rating, they are ineligible for a compensation increase for that year. MSJ at 4-5.

18.     For 2017, and 2018, Plaintiff has no reason to believe she received any low ratings based on evaluations she received. Ex. PP, Wheeler Decl. at 11. Plaintiff's direct manager throughout the majority of 2019 was Mellissa Eyeington. Ex. A, Wheeler Dep. 39:18-40:25, 41:17-42:16.

19.     Patricia Elkon, who was Plaintiff's coworker under Eyeinton, took over as Plaintiff's supervisor when Eyeington went out on leave around October of 2019. *Id.* 42:7-24, Ex. PP, Wheeler Decl.  ¶7.

20.     From July 2019 through July 14, 2020, Kevin Knapp served as both Plaintiff's and Elkon's Skip-Level manager. *Id.* 62:25-63:7.

21.     When Elkon became Plaintiff's direct manager, Defendant considered Plaintiff a "highly valued" employee. Ex. AA, AWS_Wheeler 000410-11.

22.     As Elkon's Skip-supervisor, Knapp had authority over how Elkon performed her role, including to ensure she administered her duties fairly. Ex. B, Knapp Dep.  56:10-23.

23.     In February 2020, Plaintiff got her 2019 Forte. Ex. D, AWS_Wheeler 000123-25.

24.     Plaintiff's Forte contained glowing reviews from her peers and supervisors. *Id.*

25.     In early 2020, fespite having supervised Plaintiff for just months, Elkon assigned

3

Plaintiff a "least effective" rating for 2019. Ex. HH, AWS_Wheeler 000629.

26.    Elkon performed the rating despite that Eyeington recommended to Elkon and Knapp that Plaintiff be rated "highly valued." Ex. AA, AWS_Wheeler 000410-11.

27.    Defendant put Plaintiff in Focus on Feb. 27, 2020. Ex. E, AWS_Wheeler 000129.

28.    Defendant ended Plaintiff's Focus on March 2, 2020. *Id.*

29.    In or around April 2020, Defendant rated Plaintiff's 2020 performance "least effective." Ex. KK, AWS_Wheeler 000636-37; Ex. HH, AWS_Wheeler 000629.

30.    On March 6, 2020, Elkon began working with Knapp, Plaintiff's HRBP Haissel MacFarland, and human resources representative, James Miles, to develop a Pivot plan for Plaintiff. Ex, II, AWS_Wheeler 000691-98.

31.    Defendant's stated reasons for the Pivot was Plaintiff's history of inconsistent performance, improving then back sliding, and her year-over-year ratings. *Id.*

32.    Plaintiff had been in Focus on just two occasions throughout her entire tenure. The first time, June 8, 2018-July 3, 2018, had nothing to do with Plaintiff's performance, as Plaintiff's supervisor noted: "[L]eadership ran an experiment when people transitioned into AWS . . . Everyone who transferred, no matter how complex the roles . . . were put into the plan. . . .I know the "dev list" has a negative connotation . . . You are doing fabulous and proved my theory . . . Ex. V, AWS_Wheeler 000332.

33.    The second time Plaintiff was in Focus was February 2019. Within a month, her then-supervisor, Eyeington, noted Plaintiff's performance had improved, and sixty 60 days later, Plaintiff was "meeting/exceeded all expectations for her role" and had "raised the bar" for ownership, bias for action and earn trust. Ex. E, AWS_Wheeler 000129-134.

34.    On March 20, 2020, Knapp, Elkon, and Plaintiff were copied on an email between human resources business leader, Rafael Visconti (Hispanic) and Senior Sourcing Recruiter Billy Widner (Caucasian). Ex. CC, AWS_Wheeler 000440-43. Knapp believed Visconti's email was "aggressive."

35.    Knapp responded to the group, chastising Visconti, and making excuses for Widner's provocation. *Id.* Knapp then injected Visconti's Hispanic heritage into the conversation by writing his salutations in Portuguese ("Bom Dia," "Obrigado"). *Id.*

36.    Knapp removed Visconti from the email chain and wrote: "Rafa has the stereotypical Latin fire as I have seen it a number of times over the last couple of years . . .." *Id.*

37.    Plaintiff immediately spoke to Knapp about his comments. Knapp became angry. Ex. KK, AWS_Wheeler 000636-37, Ex. PP, Wheeler Decl. ¶14

38.    Elkon responded to the customer, explaining: "We actually connected with Rafael this morning." Ex. G, AWS_Wheeler 000193-200.

39.    On March 20, 2020, Plaintiff reported Knapp's remarks (and her fear of retaliation) to Laura Macdonald ("Macdonald") in human resources. Ex. CC, AWS_Wheeler 000440, Ex. PP, Wheeler Decl. ¶15.

40.    On March 23, 2020, Knapp referred to his parents as being part of a "stubborn generation." Ex. DD, AWS_Wheeler 000451.

41.    Plaintiff reported this to Macdonald. *Id.*

42.     On March 24, 2020, Defendant put Plaintiff in Pivot. Ex. K, AWS_Wheeler 000269-71, which provided forty-five (45) days to meet expectations. Ex. K, AWS_Wheeler 000269-71.

43.     On March 26, 2020, Macdonald informed Plaintiff's HRBP, McFarland, of Plaintiff's complaints, and instructed her to pause the Pivot. Ex. U, AWS_Wheeler_000321-323.

44.     Macdonald recused herself from investigating Plaintiff's complaint because her subordinate, McFarland, served as HRBP to both Knapp and Plaintiff. *Id.* However, McFarland, did not recuse herself. Ex. BB, AWS_Wheeler 000421-39.

45.     Macdonald notified employee relations representative, Irve Klandik, of her decision to recuse, and added that Plaintiff was experiencing performance issues. Ex. T, AWS-Wheeler 000318-320.

46.     On March 26, 2022, McFarland notified Elkon to pause the Pivot.

47.     On March 30, 2020, Klandik interviewed Plaintiff concerning her complaints. Plaintiff explained Knapp's remarks were not an isolated event; he had made offensive gestures; and inappropriate jokes; and that Knapp and Elkon were dismissive towards her, ignored her, favored some employees over others, excessively monitored, and acted aggressively towards her. Plaintiff explained that she was concerned about retaliation and was the only Latina on her team. Ex. BB, AWS_Wheeler 000421-39.

48.     On April 3, 2020, Klandik interviewed Knapp. He provided a statement in which he continued to refer to Visconti as "fiery." *Id.* Ex. EE, AWS_Wheeler 000453.

49.     On April 8, 2020, Klandik informed Knapp: "Amazon has a policy prohibiting retaliation . . .  – this applies to and has been discussed with all the parties in the investigation." Ex. R, AWS_Wheeler 000299.

50.     Elkon was listed as "Involved Parties #1" in Defendant's report. Ex. BB, AWS_Wheeler 000421-39

51.     Defendant's report noted that Plaintiff's HRBP, Haissel McFarland, was granted access to the investigatory notes, despite Macdonald removing herself from the investigation due to McFarland's role as HRBP to both Plaintiff and Knapp. Ex. S, AWS_Wheeler 000303-14.

52.     On April 13, 2020, Elkon and met with Plaintiff  for a scheduled compensation call, but Elkon did not discuss compensation, instead she has some concerns about Plaintiff's performance, but did not say what those concerns were. Ex. PP, Wheeler Decl. ¶18.

53.     Plaintiff told Elkon she felt she was being retaliated against for her complaints of discrimination. Plaintiff told Elkon she intended to speak with Knapp's supervisor, Anthony Palumbo. Ex. A, Wheeler Dep. 167-68.

54.     On April 16, 2020, Plaintiff complained to Palumbo, explaining that she felt Elkon was retaliating against her. Ex. A, Wheeler Dep. 167-68.

55.     Palumbo told Plaintiff he would speak with Elkon about her concerns. *Id.*

56.     On April 21, 2020, McFarland permitted Defendant to move forward with Plaintiff's Pivot. Ex. L, AWS_Wheeler 000272-73.

57.     On April 22, 2020, Elkon informed Plaintiff for the first time that she was being subjected to a Pivot. AWS_Wheeler 000636-37.

58.     Plaintiff explicitly protested the Pivot to Elkon, reiterating her concerns of retaliation.

Ex. PP, Wheeler Decl.  ¶18,¶19,¶20.

59.     The Pivot was set to take effect on April 22, 2020 and would last approximately forty-five (45) days. Ex. H, AWS_Wheeler 000245-47, Ex. PP, Wheeler Decl. ¶23

60.     On April 27, 2020, Plaintiff told Macdonald she believed she was being subjected to Pivot in retaliation for her complaints. Ex. W, AWS_Wheeler 000339-40.

61.     Plaintiff's Pivot took effect on May 22, 2020. Plaintiff had thirty (30) days before she would be evaluated on three (3) "measurements." Ex. JJ, AWS_Wheeler 000720-32.

62.     On June 22, 2020, Elkon failed Plaintiff's Pivot. Ex. JJ, AWSWheeler 000720-32.

63.     On June 23, 2020, Elkon emailed Knapp, Miles, and MacFarland, and admitted that Plaintiff met Pivot expectation 1, despite that Elkon failed her. *Id.* Elkon explained altered measurement 1 to account for criteria that were not actually included in the Pivot. *Id.*

64.     Knapp admitted that while he reviewed Elkon's notes concerning the Pivot, he did not extend the same courtesy to Plaintiff, despite that his role required he ensure the overall fairness of the Pivot. Ex. B, Knapp Dep. 111:25-112:5; 113:8-16.

65.     When Plaintiff was informed that she failed her Pivot, she protested the results directly to Elkon. Ex. PP, Wheeler Decl. ¶26.

66.     Plaintiff appealed the results to Defendant. Ex. NN, AWS_Wheeler 001103.

67.     On July 13, Plaintiff complained to Defendant's owner, Jeff Bezos, explaining that she had been subjected to discrimination and because she complained, she was retaliated against. Ex. X, AWS_Wheeler 000371.

68.     The next day, Plaintiff's termination was effective.  Ex. A, Wheeler Dep. 130:14-16.

## STATEMENT OF ISSUES

1.     Whether summary judgment is proper, as to the causal link element of Plaintiff's *prima facie* retaliation case, when Plaintiff's evidence establishes temporal proximity within a range that the 5th Circuit has consistently held is sufficient to establish a causal connection?

2.     Whether summary judgment is proper as to the causal link element of Plaintiff's *prima facie* retaliation case when there are genuine disputes of material fact about whether Elkon was the sole decision maker responsible for the adverse actions; whether Elkon was aware of Plaintiff's protected activity; whether Plaintiff had a history of performance issues; and whether Defendant failed to follow standard company policy in its evaluation of Plaintiff's performance?

3.     Whether summary judgment is proper as to Plaintiff's retaliation claim when there are genuine disputes of material fact concerning the credibility of Defendant's non-retaliatory explanation?

4.     Whether summary judgment is proper when, in addition to showing that Defendant's explanation is unworthy of credence, there is substantial evidence of pretext, including: Defendant deviated from its normal policies to monitor and evaluate Plaintiff's performance; decision-makers provided false, inconsistent, and shifting statements about Plaintiff's performance; decision-makers made suspicious statements and engaged in suspicious conduct concerning the adverse actions at issue; and there is close temporal proximity between

Plaintiff's protected activity and the adverse actions, among other evidence probative of pretext?

5.      Whether summary judgment is proper as to the adverse action element of Plaintiff's *prima facie* disparate treatment cases when Defendant does not dispute that adverse actions took place, but instead asserts that Plaintiff cannot demonstrate adverse actions because she testified in her deposition that she believed she was placed in Pivot and terminated because of retaliation.

6.      Whether summary judgment is proper as to Plaintiff's *prima facie* disparate treatment case when Plaintiff adduces substantial evidence to show that the relevant decision-makers used racist and ageist language, endorsed the use of the same, and treated Plaintiff's coworkers outside of her protected classes more favorably?

7.      Whether summary judgment is proper as to Plaintiff's disparate treatment claims when there are genuine disputes of material fact concerning the credibility of Defendant's nondiscriminatory explanation?

8.      Whether summary judgment is proper when, in addition to showing that Defendant's explanation is unworthy of credence, Plaintiff adduces substantial evidence of pretext, including that: Defendant deviated from its normal policies to wrongly evaluate Plaintiff's performance and ensure she would fail evaluation; decision maker's provided false, inconsistent, and shifting statements concerning Plaintiff's performance; decision makers used racist and ageist language and endorsed the same; and Plaintiff's coworkers outside of her protected class were treated better, among other relevant evidence of pretext?

## **LEGAL STANDARD**

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In reviewing a motion for summary judgment, the court must indulge every reasonable inference from the underlying facts in favor of the party opposing the motion." *Thornbrough v. Columbus and Greenville R. Co.*, 760 F.2d 633, 640 (5th Cir. 1985). If "reasonable minds could differ" on "the import of the evidence," a court must deny the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).

## **ARGUMENT**

There are genuine disputes of material fact on each issue on which Defendant moves for summary judgment. A reasonable jury could return a verdict for Plaintiff on each of her claims. *See Thornbrough,* 760 F.2d at 640 ("In general, summary judgment is an inappropriate tool for resolving claims of employment discrimination, which involve nebulous questions of motivation and intent.");

*accord Hayden v. First National Bank*, 595 F.2d 994, 997 (5th Cir. 1979).

I.        **PLAINTIFF'S RETALIATION CLAIM MUST BE DECIDED BY A JURY**

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that she engaged in a (1) protected activity, (2) a materially adverse action occurred, and (3) a causal link between the two. *Long v. Eastfield College,* 88 F.3d 300, 304 (5th Cir. 1996) (citing *McMillan v. Rust College, Inc.,* 710 F.2d 1112, 1116 (5th Cir. 1983). Defendant does not dispute the protected activity or adverse action elements; it only moves on causal connection. MSJ at 17.

   A.     **The Materially Adverse Actions to Which Defendant Subjected Plaintiff are Causally Connection to Her Protected Activity**

Plaintiff's burden to show a causal link at the *prima facie* stage is "much less stringent" than her burden to show ultimate causation. *Long,* 88 F.3d at 305 n.4; *Evans v. Houston*, 246 F.3d 344, 354 (5th Cir. 2001). She need only show the "employment decision and h[er] protected activity were not wholly unrelated." *Medina v. Ramsey Steel Co.*, 238 F.3d 674 (5th Cir. 2001) (quoting *Simmons v. Camden County Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985).

           1.     Close Temporal Proximity Establishes Causal Connection

Defendant's Motion relies on an incomplete accounting of Plaintiff's evidence, asserting she complained once on March 20, 2020, *see* MSJ at 18, and experienced two adverse actions, her Pivot in March 2020, and her termination on July 14, 2020.[1] *Id.* Even with this timeline, temporal proximity is squarely within four months. The 5th Circuit has consistently held is temporal proximity within four months is sufficient, without more, to establish a causal link. *Garcia v. Pro. Cont. Servs.*, Inc., 938 F.3d 236, 241 (5th Cir. 2019) (4 months). *Hu v. Interplast Grp. Corp.*, Civil Action 6:21-CV-00056 (S.D. Tex. Sep 29, 2023) (same).

Plaintiff's evidence establishes a timeline that leaves no doubt that her protected activity and the adverse actions are linked:

_____

[1] Defendant's incomplete recitation of the evidence amounts to a failure to move for summary judgement on the totality of Plaintiff's retaliation claim.

- March 20, 2023: Plaintiff engaged in protected activity when she complained directly to Knapp and to human resources about Knapp's "stereotypical Latin fire" remarks.  Ex. LL, AWS_Wheeler 000744; Ex. CC, AWS_Wheeler 000440-43.

- March 23, 2020: Plaintiff complained to human resources concerning Knapp's ageist comments. Ex. DD, AWS_Wheeler 000451.

- March 24, 2020: Defendant subjected Plaintiff to an adverse action by placing her in Pivot. Ex. K, AWS_Wheeler 000269.[2]

- April 13, 2020: Elkon met with Plaintiff for a scheduled compensation call, but instead of discussing my compensation, Patricia Elkon said she has some concerns about my performance. Patricia Elkon did not tell me what her concerns were  Ex. PP Wheeler Decl. ¶19[3]

- April 13, 2020: Plaintiff complained to Elkon that she believes Elkon's critical view of her performance was retaliation for reporting Knapp's comment. Ex. PP, Wheeler Decl. ¶19

- April 16, 2020: Plaintiff complained to Palumbo concerning Elkon's retaliation. Ex. A, Wheeler Dep. 164-67, Ex. PP, Wheeler Decl. ¶ 21.

- April 22, 2020: Defendant placed Plaintiff in Pivot. Ex. H, AWS_Wheeler 000245-47.[4]

- April 22, 2020: Plaintiff protested to Elkon about being placed in retaliatory Pivot. Ex. PP, Wheeler Decl.  ¶22.

- April 27, 2020: Plaintiff complained to Laura McDonald concerning retaliation. Ex. W, AWS_Wheeler 000339-40. Ex. PP, Wheeler Decl. ¶24.

- May 14, 2020: Patrica Elkon called an impromptu one on one meeting with me, and HR Business Partner ("HRBP") Haisel McFarland  to "discuss questions I had on the Pivot". During that call I requested a status update from Haisel McFarland on the investigation I requested. Haisel response was: "Oh yeah, we're moving forward with your pivot." No reason was provided to me for the decision to do so. Ex. PP, Wheeler Decl. ¶ 25.

- June 22, 2020: Defendant failed Plaintiff's Pivot.[5] Ex. JJ, AWS_Wheeler 000720-32.

- Plaintiff protested to Elkon that Defendant failed her pivot in retaliation for her complaints. Ex. PP, Wheeler Decl.  ¶27.

- July 13, 2020: Plaintiff complained to Jeff Bezos, owner of Defendant, about discrimination and retaliation. Ex. X, AWS_Wheeler 000371.

- July 14, 2020: Defendant made Plaintiff's termination effective.

Plaintiff is entitled to have her evidence viewed in its totality. *Berry v. Sheriff's Office Ouachita*

---

[2] *Lemonia v. Westlake Mgmt. Servs.*, 22-30630 at 15 (5th Cir. Oct 18, 2023) (holding performance improvement plan that results in termination is a materially adverse action) (citing *Ray v. Tandem Computs., Inc.*, 63 F.3d 429, 435-36 (5th Cir. 1995); *Welsh v. Fort Bend Indep. Sch. Dist.*, 941 F.3d 818, 823, 826 (5th Cir. 2019)).

[3] *See Mitchell v. Snow*, No. 08-20448 at 4 (5th Cir. Jun 17, 2009) (a negative performance review that results in lost "'step increase' constitutes a materially adverse employment action).

[4] *See supra* note 2.

[5] *Id.*

9

*Par.*, No. 20-30243 (5th Cir. Oct 26, 2020). She easily establishes causal connections based on temporal proximity alone. *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (4 months is sufficient); *Johnson v. Halstead*, 916 F.3d 410, 421 (5th Cir. 2019) (same).

### 2.   Elkon was Not the Sole Decision maker

While Defendant argues that Plaintiff's supervisor, Elkon, was the sole decision maker at issue,[6] its assertion conflicts with evidence that shows other decision makers who were aware Plaintiff's protected activity provided oversight, guidance, support, and approval for almost every employment decision at issue. Not even Elkon maintains she acted alone. *Ex. C,* Elkon Dep. 121:8-11("Q. As a manager, are you the person solely responsible for whether or not an employee would be terminated from Amazon? A. No."). While Elkon may have been Plaintiff's first point of contact, her authority was entirely cabined by her skip-supervisor, Knapp, as well as HRBP McFarland, and her subordinate, James Miles.

Knapp—who served as both Elkon's and Plaintiff's skip-supervisor, and who was the subject of Plaintiff's protected activity on March 20 and March 23, 2020, admitted he reviewed Plaintiff's Pivot before it was given to her, Ex. B, Knapp Dep. 48:25-49:5; provided feedback and edits to Elkon, which she incorporated; *Id.* 50:16-51:25; 55:9-20; and had ultimate responsibility over Elkon to ensure she accurately characterized Plaintiff's performance and conducted the Pivot fairly. *Id.* at 53:5-20, 56:10-23. Ultimately, Knapp signed off on the Pivot. *Id.* at 111:10-25*; See also* Ex. H, AWS_Wheeler 000247. Knapp reviewed documents, action plans, processes, and communications that Elkon submitted to him concerning Plaintiff, *Id.* 85:23-87:13, although he did not extend Plaintiff the same courtesy, failing to review documents that Plaintiff provided in opposition to Elkon's characterization of her performance. *Id.* 111:25-112:5; 113:8-16. Knapp was also involved in giving Plaintiff her "least effective" rating in both 2019 and 2020. Ex. C, Elkon Dep. 119:8-121:7. Knapp was included in almost every communication that Elkon sent or received concerning Plaintiff's Pivot, and in turn, Knapp

---

[6] *See, e.g.,* MSJ at i, 2, 13, 16-18.

would keep his supervisor, Anthony Palumbo, aware of developments. For example, on April 21, 2020, Knapp wrote to Palumbo: "We are back on schedule to deliver the Pivot[.]" Ex. L, AWS_Wheeler 000272-73 (emphasis supplied). Similarly, when Plaintiff lost her Pivot appeal, Knapp emailed Palumbo: "We are working on a separation date[.]" Ex. O, AWS_Wheeler_000280 (emphasis supplied); Ex. P, AWS_Wheeler_000281[7]

Further evidence that Elkon did not act alone is a on June 5, 2020, seventeen (17) days before Defendant failed Plaintiff on the Pivot, Elkon sent Knapp an email informing she would "fill his in when he [returned the following] week. Ex. I, AWS_Wheeler_000248. Elkon was merely part of the group "we."

McFarland and Miles were also aware of Plaintiff's protected activity and had material influence, involvement, and authority over the employment decisions at issue. McFarland was involved in the decision to place Plaintiff in Pivot. Ex. Y AWS_Wheeler 000401; Ex. Z, AWS_Wheeler 000406-07 ("In partnership with her HRBP, Haissel McFarland, they decided to move Melissa to Pivot . . ."); pause Plaintiff's Pivot, *Id.* ("Haissel put the pivot entry on hold . . ."); and reengage the Pivot. Ex. L, AWS_Wheeler 000272-73 ("Haissel let us know . . . we have the green light."). Similarly, Miles worked with Elkon in developing the Pivot from the ground up. Ex. II, AWS_Wheeler 000691-98; advised Elkon throughout the evaluation process, Ex. N, AWS_Wheeler 000275; and conspired with Elkon to fail a Pivot measurement that Plaintiff actually passed, Ex. J, AWS_Wheeler 000262-64. Human resource personnel were also involved in Plaintiff's OV ratings, Ex. C, Elkon Dep. 121:8-122:11, and approved the decision to place, set the duration of, and monitor Plaintiff in Focus. *Id.* 87:2-88:9, 105:5-07:4. Finally, Elkon admits she worked in "close partnership" with McFarland and Miles in firing Plaintiff. *See* Ex. C, Elkon Dep. 57:16-25.

The evidence clearly shows Knapp, McFarland, and Miles, as well as other key decision-

---

*See, e.g.,* MSJ at i, 2, 13, 16-18.
to "Melissa Wheeler has decided to leave Amazon" she was terminated.

makers, such as Palumbo and Macdonald, were intimately involved with key decisions every step of the way.[8] Defendant's argument to the contrary, at best, raises genuine disputes of material fact, which must be decided by a jury.

3.      Elkon was Aware of Protected Activity Before the Adverse Actions

While Elkon asserts for the first time in a declaration in support of Defendant's Motion that she had no knowledge of Plaintiff's complaints of discrimination, *See* Ex. MM, Elkon Decl. ¶15, Defendant's business records show she became aware no later than early-April 2020.

On April 8, 2020, Defendant informed Knapp its investigation into his racial and ageist remarks was complete and noted: "Amazon has a policy prohibiting retaliation . . . this applies to and *has been discussed with all the parties* in the investigation." Ex. R, AWS_Wheeler 000299 (emphasis supplied). Elkon was identified as "Involved Part[y] #1" in the investigation report. Ex. BB, AWS_Wheeler 000421-22. Plaintiff is entitled to have a jury measure the conflict between Elkon's new, self-serving testimony and Defendant's business records.

Similarly, on April 13, 2020, Elkon and Plaintiff met for a scheduled compensation call, but instead of discussing compensation, Elkon said she had some concerns about Plaintiff's performance. Patricia Elkon did not tell Plaintiff what her concerns were. Ex. PP, Wheeler Decl.  ¶18. I complained to Patrica Elkon that I believed her critical view of my performance was retaliation for reporting Kevin Knapp's comment. *Id.* Plaintiff told Elkon she felt she was being retaliated against for her complaints against Knapp and that she intended to speak with Knapp's supervisor, Anthony Palumbo. Ex. PP, Wheeler Decl.  ¶19  Plaintiff reported retaliation to Palumbo on April 16, 2020. Ex. PP, Wheeler Decl. ¶20. Palumbo told Plaintiff he would speak with Elkon (and Knapp) about Plaintiff's complaint. Ex. A, Wheeler Dep. 167-68. Plaintiff is entitled to the inference that Palumbo did as he said he would, and therefore Elkon knew of Plaintiff's protected activity.

---

[8] *See Long,* 88 F.3d at 307 (holding a defendant cannot evade liability by claiming decision makers merely rubber-stamped discriminatory decisions).

Additionally, on May 14, 2020, Elkon called an impromptu one-on-one meeting with Plaintiff and invited McFarland to "discuss questions Plaintiff had on the Pivot". During that call, Plaintiff requested a status update from McFarland on the investigation she requested. Ex. PP, Wheeler Decl. ¶25 McFarland's response was: "Oh yeah, we're moving forward with your pivot." No reason was provided to Plaintiff for the decision to do so. *Id.*   During that May 14, 2020 meeting, Plaintiff told Elkon and McFarland that she believed she was being treated unfairly and her efforts and achievements had been overlooked. She told Elkon: "I believe you and Kevin are retaliating against me due to me sharing discrimination concerns with Laura".  Ex. PP, Wheeler Decl.  ¶26.

Further, after Elkon failed Plaintiff on the Pivot in June of 2020, Plaintiff protested directly to Elkon about the Pivot evaluation, explaining she believed retaliation was at play. Ex. PP, Wheeler Decl. ¶23,¶27. While Elkon acknowledges Plaintiff "expressed concerns on the Pivot content and expected deliverables" and intended to appeal, Elkon stops short of admitting Plaintiff complained of retaliation or discrimination. *See* Ex. J, AWS_Wheeler 000262; *See Thornbrough, v.* 760 F.2d at 638 ("Employers are rarely so cooperative as to include a notation in the personnel file 'fired due to age,' or to inform a dismissed employee candidly that he is too old for the job.").

Finally, Elkon knew or should have known about Plaintiff's complaint against Knapp no later than March 20, 2020 because both Elkon and Plaintiff were copied on the email in which Knapp made the racially discriminatory remarks. Ex. Q, AWS_Wheeler 000285. Knapp's statements triggered Defendant's reporting requirement. Ex. GG, AWS_Wheeler 000619-20. Elkon had no basis to believe that Plaintiff, especially as a Latina, would violate Defendant's policy. It is reasonable to infer that Elkon knew that Plaintiff engaged in protected activity because Plaintiff was required to. *Klebe   v. Univ. of Texas Health Sci. Ctr. at San Antonio*, No. 10-50458 at 2 (5th Cir. Nov 17, 2011) (upholding jury verdict on causation when relevant decision-makers knew or *should have known* of plaintiff's protected activity). This inference is buttressed by the fact that Elkon learned just days later

that the Pivot was paused. Ex. T, AWS_Wheeler 000318-20. To infer that Elkon did not connect the

dots is an indulgence to which Defendant is not entitled at summary judgment. *See Thornbrough*, 760

F.2d 633 at 640.

Taken together—giving Plaintiff all reasonable inferences—the question is not if, but when,

Elkon learned of Plaintiff's protected activity. There are simply too many evidentiary conflicts to

permit summary judgment on this issue.  Defendant's motion must be denied.

### 4.  Other Evidence Demonstrating Causal Connection

Defendant argues that for Plaintiff to show causal connect at the *prima facie* stage, she must

prove what functionally amounts to ultimate causation. *See* MSJ at 18-20. It is well settled that the

causation burden at the *prima facie* stage is "much less stringent" than that of ultimate causation. *Long*,

88 F.3d at 305 n.4; *Evans,* 246 F.3d at 354. Yet, Defendant argues Plaintiff must show she had a history

of good performance and Defendant did not deviate from its policies. *See* MSJ at 18-20.[9] Plaintiff's

evidence rebuts Defendant's arguments, as discussed in detail *infra* Section II. In brief, Plaintiff's

evidence shows that she was performing her job excellently, Ex. D, AWS_Wheeler 000123-25; Ex. FF,

AWS_Wheeler 000603-07; Ex. AA, AWS_Wheeler 000410-11; Ex. QQ, MWheeler_000001; Ex. RR,

MWheeler_000002; Ex. SS, MWheeler_000002had received numerous accolades from her peers and

supervisors, *Id*; was working towards a promotion, had never previously been in Pivot, and historically,

had only ever had her performance questioned briefly in early-2019, to which she responded by

"exceeding all expectations" and "raising the bar" over a sustained period. Ex. E, AWS_Wheeler

000129-34. Further, Plaintiff's evidence shows that Defendant failed to adhere to company policies

when it ignored Plaintiff's supervisor's recommendation to rate Plaintiff as "HV" for 2019 Ex. AA,

---

[9] Defendant cites *Dehart v. Baker Hughes*, 214 F. App'x 437, 442-43 (5th Cir. 2007) for the proposition that to prove causal connection, Plaintiff must show that she did not have a history of discipline and that Defendant followed its polices when it subjected her to adverse actions. *See* MSJ at 19-20. *Dehart* is inapposite. In *Dehart*, there was a seven-and-a-half-month gap between the protected activity and adverse action. *Dehart,* 214 F. App'x at 442-43. The court looked past temporal proximity, noting "conclusions drawn from a lack of suspicious timing are less compelling than those drawn from the existence of suspicious timing." *Id*. Moreover, the *Dehart* court's analysis cited directly to *Nowlin v. Resolution Trust Corp.*, 33 F.3d 498, 508 (5th Cir. 1994), *id.*, but *Nolan* dealt with ultimate causation (*but for*), not causal connection at the *prima facie* stage. *See also Jenkins v. Orkin Exterminating Co., Inc.,* 646 F. Supp. 1274, 1278 (E.D. Tex. 1986)  (cited in *Nolan,* analyzing ultimate causation).

AWS_Wheeler 000410-11; conducted a 2020 rating just months into the year; *See* Ex. HH, AWS_Wheeler 000629; MSJ at 5; only allowed Plaintiff four (4) days in Focus when thirty to sixty (30-60) days is the standard; Ex. E, AWS_Wheeler 000129-34; and only allowed Plaintiff thirty (30) days in Pivot when forty-five to sixty (45-60) days is the standard. Ex. C, Elkon Dep. 116:15-117:1.

Along with the evidence of close temporal proximity and relevant decision makers' awareness of the protected activity, Plaintiff undoubtedly establishes the causal link element.

## B.   Defendant's Explanation is Unworthy of Credence and Plaintiff Provides Substantial Evidence of Pretext

Plaintiff's *prima facie* case raises an inference of discrimination that shifts the burden to Defendant to *produce* evidence showing the adverse actions were taken for legitimate, non-retaliatory reasons. *Parker*, 323 F. App'x at 327. If Defendant meets its burden, it is up to Plaintiff to show that Defendant's explanation lacks credibility or to present other evidence pretext. *Id.; St. Mary's Honor Center v. Hicks*, 113 S.Ct. 2742, 2749 (1993).

While Defendant argues Plaintiff's alleged subpar performance excuses its conduct, even a cursory look behind its explanation exposes that it is a ruse. There are genuine conflicts of material fact concerning the true reason for Defendant's conduct, which require a jury to resolve.

### 1.   Defendant's Explanation is Unworthy of Credence

Over the four (4) years that Plaintiff worked at Defendant, she was repeatedly rated "highly valued." (HV) Ex. AA, AWS_Wheeler 000410-11. The only times she received less than HV were under suspicious circumstances: Elkon's 2019 and 2020 ratings. Ex. HH, AWS_Wheeler 000629. Plaintiff's work was praised by her peers, customers, and supervisors. Ex. D, AWS_Wheeler 000123-25; Ex. FF, AWS_Wheeler 000603-07; Ex. QQ, MWheeler_000001; Ex. RR, MWheeler_000002; Ex. SS, MWheeler_000002. She was working towards a management position. Ex. AA, AWS_Wheeler 000410-11. Only twice over the course of her entire tenure was her performance in Focus. Ex. E, AWS_Wheeler 000129-34. The first time had nothing to do with her performance, as her

15

supervisor noted:

> "[L]eadership ran an experiment . . . Everyone who transferred, no matter how complex the roles they were working on were put into the plan. . . . I know the "dev list" has a negative connotation . . . You are doing fabulous and proved my theory[.]"

Ex. V, AWS_Wheeler 000332. The second time, in early 2019, Plaintiff's supervisor, Eyeington, quickly determined Plaintiff's performance not only improved, but Plaintiff "continued with her improved performance for the past 60 days, meeting/exceeding all expectation in her role. . . . She has raised the bar in ownership, bias for action and earn trust." Ex. E, AWS_Wheeler 000129-34. Indeed, Eyeington recommended Plaintiff be rated HV in 2019. Plaintiff continued to perform as a highly valued employee throughout 2019, with her supervisor describing;

> "Melissa's superpower is her tenacity. Even in the face of an overwhelming workload, she is able to have a positive demeanor, and continue to provide a top notch candidate experience. I'm impressed by Melissa's eagerness to make an impact in the organization she supports and her willingness to mentor, train and coach others on her immediate team."

Ex. D, AWS_Wheeler 000123-25. Plaintiff continued to be praised into 2020, with Elkon herself, describing:

> "Melissa is a strong relationship builder, quickly earning trust with HMs, candidates, and peers. She operates with professional maturity and business acumen, which supports her success in the HR4HR/HRBP recruiting space. She also demonstrates good backbone and is able to independently remove roadblocks that could impede success. . . .
>
> Melissa should continue to think big in her role and take risks with our recruiting approach to drive continuous improvement. Additionally, she should continue to seek inclusive strategies for collaboration and focus on driving clear communication, especially when engaging in projects/ initiatives with peers. This will not only elevate the quality of the deliverables but also ensure all stakeholders are aligned."

Ex. FF, AWS_Wheeler 000603-07.

Defendant does not attempt to square the evidence of Plaintiff's stellar performance with its characterization of her as a nightmare employee. Rather, it attempts to distract and mislead, claiming Plaintiff could not have been retaliated against because the Pivot was planned before Plaintiff's protected activity. Not only does this argument fail to explain the numerous adverse actions that occurred after Plaintiff's protected activity, but all this really shows is that Defendant was mistreating

Plaintiff even before her March 20, 2020 complaint. *See infra* Section II (disparate treatment). Nor does this explain why in March and again in April, Defendant was set to give Plaintiff forty-five (45) days in Pivot, commensurate with company policy, yet in May when the Pivot took effect, the time was inexplicably reduced to thirty (30) days—less time than Defendant typically provides. Ex. H, Ex. K, AWS_Wheeler 000269-71 (March: 45 days); AWS_Wheeler 000245-47 (April: 45 days); Ex. JJ, AWS_Wheeler 000720-32 (May: 30 days); Ex. C, Elkon Dep. 115:23-117:1 (45-60 is standard). Moreover, Defendant admits it gave Plaintiff the exact same Pivot in May that it planned in March. MSJ at 7. In other words, between March 6, 2020, when Elkon began planning the Pivot, and May 22, 2020, when the Pivot took effect, Defendant failed to account for Plaintiff's performance during this approximate three-month period of time. *See* Ex. II, AWS_Wheeler 000691-98; Ex. JJ, AWS_Wheeler 000720-32. Defendant does not provide any evidence to show the measurements in early-March 2020 were even still relevant in late-May 2020 or that Plaintiff's performance in May justified Pivot. *Compare* Ex. H, AWS_Wheeler 000245-47 (May Pivot) *with Ex. K, AWS_Wheeler 000269-71* (March Pivot). Even *assuming arguendo* that Defendant's reason for the March Pivot was legitimate, it produces no evidence to show the same underlying performance issues persisted in late-May 2020. This demonstrates the arbitrary, punitive nature of the Pivot, not a legitimate performance improvement measure.

Defendant's explanation is swallowed by additional indicia of unreliability. For example, Defendant claims it engaged in the adverse actions because of "three years of poor performance," MSJ at 2, because Plaintiff "improves then slides back." Ex. II, AWS_Wheeler 000691-98.  But Defendant produces scant, if any, evidence of any such "history" or inconsistency. *See Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015) (lack of documentation of a purported event coupled with other evidence casting doubt on such occurrence demonstrates pretext). Plaintiff was rated "highly valued" in 2018. Her 2018 Focus had nothing to do with a performance deficiency.

Defendant's assertion otherwise merely undercuts the credibility of its explanation. MSJ at 11. The only relevant performance datapoint, the early-2019 Focus, occurred almost a year before Defendant later claimed Plaintiff had a "history" of performance issues. Ex. E, AWS_Wheeler 000129-134. Within thirty days, Plaintiff's performance improved. *Id.* This is a hiccup, not a history. After sixty days, Plaintiff sustained her improvement and "exceeded all expectations for her role" and had "raised the bar." *Id.* This is precisely the opposite of "improves then slides back." In early 2020, Plaintiff was set to receive an HV rating for the third year in a row. Ex. AA, AWS_Wheeler 000410-11. It was only after Defendant ignored Eyeington's recommendation that Plaintiff received a "least effective" rating for 2019. *Id.* And, just months into 2020, Defendant inexplicably rated Plaintiff "least effective" for the year. The evidence does not show anything remotely close to "three years of poor performance." The question is "What motive does Defendant have to misrepresent Plaintiff's performance?" It is for a jury to decide.

Similar misrepresentations abound: Defendant claims Eyeington gave Plaintiff the "least effective" rating in 2019. MSJ at 4. It was actually Elkon. Ex. HH, AWS_Wheeler 000629. Defendant claims upon placing Plaintiff in Focus, Elkon met with her weekly to help her improve. MSJ at 5; Ex. C, Elkon Dep at 107:5-11. Plaintiff was in Focus for four (4) days under Elkon. Ex. E, AWS_Wheeler 000129-000134. Elkon did not meet with Plaintiff weekly. Ex. HH, AWS_Wheeler 000629. Defendant goes on to claim Elkon's phantom "weekly" meetings were the basis for Plaintiff's 2020 "least effective" rating. MSJ at 5. In fact, on January 21, 2020, March 2, 2020, and April 9, 2020, Elkon praised Plaintiff's work. Ex. QQ, Ex. RR, Ex. SS  The evidence raises serious credibility issues about Defendant's explanation.

Finally, Defendant's "burden is one of production, not persuasion, and 'can involve no credibility assessment.'" *Parker,* 323 F. App'x at 327 (quoting *Reeves v. Sanderson Plumbing Prods.,* Inc., 530 U.S. 133, 142 (2000). Defendant's explanation relies on numerous undocumented assertions,

inferences to be drawn in its favor, and facts that require the Court to engage in credibility determinations. Defendant fails to meet its burden of *production*. There are simply too many questions about Defendant's explanation to permit summary judgment.

> 2.    Plaintiff Adduces Substantial Evidence of Pretext

In addition to showing Defendant's explanation is unworthy of credence, Plaintiff's pretext evidence raises conflicts of material fact that require a jury. Any evidence that tends to show a "retaliate[ory] motive more likely motivated [an] employer's decision" is probative of pretext. *Berry v. Sheriff's Office Ouachita Par*., No. 20-30243 at 8 (5th Cir. Oct 26, 2020).

> i.    *Defendant deviated from its normal policies*

"A plaintiff can also show pretext by showing a departure from standard procedure." *McMichael v. Transocean Offshore Deepwater Drilling, Inc*., 934 F.3d 447, 459 (5th Cir. 2019). Here, Defendant deviated from its normal procedures in at least three (3)material ways.

First, an employee is typically afforded between thirty to sixty (30-60) days to complete Focus. Ex. C, Elkon Dep. 86:15-87:1. Defendant gave Plaintiff four (4) days. Ex. E, AWS_Wheeler 000129-134. Defendant justifies its decision to put Plaintiff in Pivot, in part, by claiming that despite Elkon's meeting with Plaintiff weekly during Focus, Plaintiff's performance did not improve. MSJ at 5. As discussed above, this never happened. This explanation emphasizes the harm caused by denying Plaintiff the standard duration of Focus: Plaintiff should have, but did not, receive the support that Defendant claims legitimized its decision to put Plaintiff in Pivot.

Second, similarly, Plaintiff was only given thirty (30) days for her Pivot when forty-five to sixty (45-60) days is the standard time. Ex. C, Elkon Dep. 115:23-117:1. While Plaintiff was first given forty-five (45) days in both March and April, when the Pivot went into effect in May, the time was inexplicably reduced by thirty (30) percent. Plaintiff is entitled to a jury to determine why Defendant penalized her fifteen (15) days.

Finally, Defendant permitted Elkon to evaluate Plaintiff's 2020 performance just months into

the year. Defendant's standard policy is to perform yearly ratings at the end of the year. Ex. B, Knapp

Dep. 27:9-19. While Defendant provides no explanation (or evidence) why it permitted Elkon to

evaluate Plaintiff's performance early—after Plaintiff engaged in protected activity—it points to the

2020 rating as a basis for the Pivot. MSJ at 1.

## ii.     Defendant took actions to ensure Plaintiff could not pass Pivot

On June 23, 2023, Elkon emailed Knapp, Miles, and McFarland and admitted Plaintiff "did

meet the measurements" for Pivot Expectation 1. Ex. J, AWS_Wheeler 000262. However, Elkon

explained that the group changed the expectation, so that it would look like Plaintiff failed instead. *Id.*

This is an egregious example of dishonesty, which on its own, should cause the Court to deny

Defendant's Motion. But what makes this conduct even more outrageous is that each of the "intrinsic

errors" that Elkon noted as the basis for her decision to fail Plaintiff on Measurement 1 occurred on the

first day of the Pivot, May 22, 2020.[10] Elkon did not note any additional "intrinsic errors" for any other

dates during the Pivot. The only logical explanation is that Plaintiff did not make any. *See Id.*

Defendant failed her anyway.

## iii.     Inconsistent, false, or shifting explanations

Defendant's explanation is riddled with exactly the type of inconsistent, false, or shifting

statements about Plaintiff's performance on which courts routinely rely on to deny summary judgment.

*Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002) (holding plaintiff established pretext with evidence

that, *inter alia,* a relevant decision makers omitted the fact that he was involved in a key meeting and

falsely claimed other decision makers were not involved in material decision when they were); *See also*

*Burrell v. Dr. Pepper/Seven Up Bottling Grp., L.P.*, 482 F.3d 408, 412 n.11 (5th Cir. 2007); *Berry,* No.

20-30243 at 8.

In addition to the examples described above, Defendant made numerous of assertions that are

false or misleading, including but not limited to, claiming: (1) Eyeington gave Plaintiff a least effective

---

[10] No evidence shows the "intrinsic errors" occurred after the Pivot took effect on May 22.

rating in 2019 when it was actually Elkon; Ex. HH, AWS_Wheeler 000629; (2) Elkon met with Plaintiff weekly during her Focus when the Focus only lasted four days;[11] MSJ at 4-5; (3) Plaintiff failed the Pivot when Elkon admitted Plaintiff met Expectation 1, but Elkon altered the expectations after the evaluation period was over; *See* Ex. M, AWS_Wheeler_000274; and (4) Plaintiff had a history of negative performance, in part due to her 2018 Focus, which actually had nothing to do with Plaintiff's performance. Ex. V, AWS_Wheeler 000332.

*iv.*     *Suspicious statements that bear directly on Defendant's intent*

Decision makers who were involved in the adverse actions at issue engaged in suspicious conduct from which a reasonable juror could determine that retaliation was Defendant's true motive. *See Berry*, No. 20-30243 at 8. For example, Laura MacDonald, the HR representative who first received Plaintiff's complaint about Knapp's racial remark told ER consultant, Ivre Kladnik: "Another aspect of this case . . . Melissa received an LE rating this year and for the second year in a row." Ex. T, AWS_Wheeler_000318-20. Plaintiff's complaints about Knapp were not related to Plaintiff's performance. Ex. Q, AWS_Wheeler 000285. At this point, Plaintiff was not aware Defendant deemed her to have performance issues. McDonald's statement shows Defendant was immediately linking Plaintiff's protected activity to her performance.

Defendant's retaliatory intent can also be inferred from its decision not to put any safeguards in place to ensure Plaintiff would be protected from retaliation. A reasonable juror might inquire: If Defendant was concerned about retaliation on March 26, 2020 when it suspended the Pivot after Plaintiff complained, why was it not similarly concerned on April 22, 2020 when it reinstated the Pivot without any buffer between Plaintiff, Elkon, Knapp, McFarland, and Miles. While Defendant may argue that it reinstated the Pivot without precaution because it determined Knapp did not violate its anti-discrimination policy. This would miss the mark. Defendant's determination about Knapp did not

---

[11] Defendant fails to produce any evidence of when these meetings or conversations too place. *See Burton*, 798 F.3d at 240 (lack of contemporaneous documentation coupled with other evidence showing the import of such absence of documentation points to pretext).

change the fact that Plaintiff engaged in protected activity.

*v.     Prolonged campaign of day-to-day mistreatment*

The adverse actions Plaintiff experienced cannot be divorced from the evidence that shows that Elkon and Knapp were systemically treating Plaintiff worse than they treated their other subordinates who did not report discrimination. *See Klebe v. Univ. of Texas Health Sci. Ctr. at San Antonio*, No. 10-50458 (5th Cir. Nov 17, 2011) (holding "Dr. Walter's animus toward Klebe after he filed the age discrimination claim" was probative of causation). By way of example and not limitation, Elkon was rude, dismissive, and curt with Plaintiff. She excessively scrutinized her work, often trying to hold her accountable for items over which Plaintiff had no control or authority. Elkon would cut Plaintiff short during group meetings and made efforts to ostracize her among the team. Ex. A, Wheeler Dep. 157:3-4, 157:18-25; Similarly, Knapp was rude to Plaintiff and often cut Plaintiff off during meetings. Ex. A, Wheeler Dep. 154:21-23.

*vi.     Temporal Proximity*

While temporal proximity alone is not enough to prove a pretext, it is a relevant pretext consideration. *Fabela v. Socorro Independent School Dist,* 329 F.3d 409, 418 n.9 (5th Cir. 2003). The suspicious timing of Defendant's adverse actions gives weight to her evidence of pretext. *Id.* As Defendant admits, at no point does the time between Plaintiff's protected activity and the adverse action exceed four (4) months, which the 5th Circuit has consistently held is sufficient. *See supra* Section (I)(A)(1) (collecting cases). Here, however, temporal proximity is much closer than four (4) months. Oftentimes, mere days separate protected activity and adverse actions.

## II.     <u>PLAINTIFF'S DISPARATE TREATMENT CLAIMS MUST REACH A JURY</u>

In disparate treatment claims under *McDonald Douglas*, Plaintiff establishes a *prima facie* case of disparate treatment by demonstrating that she belonged to a protected class, suffered an adverse action, was qualified, and suffered the adverse action because of her membership in the protected class. *Goudeau,* 793 F.3d at 474; *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 350 (5th Cir. 2005); *Rachid v.*

22

*Jack in the Box, Inc.,* 376 F.3d 305, 309 (5th Cir. 2004) (age); *Rutherford v. Harris County Texas*, 197

F.3d 173 (5th Cir. 1999) (gender).

A.     **Plaintiff's Evidence Establishes a *Prima facie* Case of Disparate Treatment based on Age, Race, and National Origin.**

Defendant's Motion disputes two elements of Plaintiff's *prima facie* disparate treatment claims:

(1) adverse action and (2) because of Plaintiff's membership in the protected classes.

1.     Plaintiff Establishes the Adverse Action Element

Defendant does not dispute that Plaintiff experienced adverse actions. Rather, Defendant argues

because Plaintiff testified at her deposition that she believed she was placed in Pivot and ultimately

terminated due to retaliation, she could not have been subjected to discrimination based on her age,

race, or national origin. *See* MSJ at 10. This argument is not supported by law. There is no subjective

belief element to a disparate treatment claim. Even if there were, Plaintiff testified repeatedly that she

believed Defendant discriminated against her on the basis of her race, age, and national origin.[12]

Defendant was free to examine Plaintiff directly if she felt discrimination played a role in the Pivot, her

termination, or any other adverse action at issue. It failed to do so. Defendant's attempt to use summary

judgment to remediate its failure is improper.

Indeed, Plaintiff suffered numerous adverse actions sufficient to support her disparate treatment

claims. The 5th Circuit recently held that adverse actions in Title VII disparate treatment claims no

longer need to constitute ultimate employment actions. *Hamilton v. Dallas Cnty.,* 79 F.4th 494 (5th Cir.

2023). While the court did not precisely describe what conduct will rise to the level of an adverse

action, it gave examples of conduct that does: "denying seniority privileges to female officers while

allowing male officers to exercise theirs;" "requiring female officers to work weekends but not male

---

[12] *See, e.g., generally* Ex. A, Wheeler Dep. 23:25-24:5 (A. That I was -- there was some injustice, that there was discrimination.); 154:17-23 (Q. Did Kevin do anything else that you believe discriminated against you because of your race and your national origin . . . ? A. He was also, like I mentioned, incredibly dismissive in meetings. He was dismissive, wouldn't listen, very hard to get him to respond to me.); 157:18-25 ("Did Patricia Elkon discriminate against you because of your race and your national origin? A. I felt like it was. Q. Based on what? A. . . . she would intentionally try to embarrass me in front of my peers. . . . She was incredibly harsh on calls.  It was just really a difficult -- it was horrible  behavior.  Q. Was Ms. -- did Ms. Elkon embarrass you  because you were Hispanic?  A. I'm going to say yes.").

23

officers;" requiring "black team members . . . to work outside without access to water, while . . . white team members worked inside with air conditioning;" and "assigned night and day shifts based on race." *Id.*

Under *Hamilton,* Plaintiff suffered several adverse actions, including Defendant issuing negative OV ratings to Plaintiff in 2019 and 2020, which deprived Plaintiff of her yearly compensation increases,[13] *Id.* (effects in compensation is an adverse action); Defendant putting Plaintiff in Focus, which eventually led to her termination, *See James v. Booz-Allen & Hamilton, Inc*., 368 F.3d 371, 377 (4th Cir. 2004)( "[A] poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.") (internal quotation marks omitted); Defendant putting Plaintiff in Pivot, *Jensen-Graf v. Chesapeaker Employers' Ins. Co*., 616 Fed. Appx. 596, 598 (4th Cir. 2015) (a performance improvement plan could be actionable if it is used as a basis to alter the terms and conditions of employment); Defendant discriminatorily evaluating Plaintiff's Pivot, *See Id.*; and ultimately, discriminatorily terminating Plaintiff's employment.

In addition to the Pivot and termination, a reasonable jury could easily find that Plaintiff experienced other adverse actions sufficient to support her *prima facie* case.

## 2.   Plaintiff Suffered Adverse Actions Because of Her Protected Classes

Plaintiff may prove disparate treatment with any direct or circumstantial evidence that gives rise to an inference that more likely than not her inclusion in protected classes influenced an employment decision. *See Thornbrough v. Columbus & G.R.R.*, 760 F.2d 633, 638 (5th Cir. 1985); *Johnson v. Uncle Ben's, Inc*., 657 F.2d 750 (5th Cir. 1981) (citing *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S. Ct. 2943 2949, 57 L.Ed.2d 957 (1978).

Probative evidence includes: (1) stereotypes, code words, or other language reflecting race-based or age-based animus; *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989); *Thornbrough*,

---

[13] MSJ at 5.

F.2d at 643 (5th Cir.); (2) discrimination against others based on race or age ("me too" evidence); *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008);  and (3) comparator evidence, *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998).

Plaintiff's evidence shows that Knapp used offensive race/national origin and age-based language that directly informed his motivation in his treatment of Plaintiff. On March 20, 2020, Knapp, Elkon, and Plaintiff were copied on an email between human resources business leader, Rafael Visconti (Brazilian), and Senior Sourcing Recruiter Billy Widner (Caucasian). Knapp believed Visconti's email was "aggressive" and was concerned that Widner would be offended. Ex. Q, AWS_Wheeler 000285-93. Knapp immediately responded to the group, chastising Visconti, and making excuses for Widner's provocation. *Id.* Knapp immediately injected Visconti's Hispanic heritage into the conversation by writing his salutations in Portuguese ("Bom Dia," "Obrigado"). *Id.* Knapp removed Visconti from the email chain (but did not remove Plaintiff) and wrote: "Rafa has the stereotypical Latin fire as I have seen it a number of times over the last couple of years in working with him." *Id.* Plaintiff confronted Knapp and he became angry. She immediately reported the incident. Ex. CC, AWS_Wheeler 000440-43. When Knapp eventually provided a statement to Defendant, he doubled down, again referring to Visconti as "very fiery." Ex. EE, AWS_Wheeler 000453. A reasonable juror could easily conclude that Knapp's stereotyping and disparaging comments about Hispanics at large, inform his specific decision-making with respect to Plaintiff, and that Knapp deliberately did not remove Plaintiff from the email chain to ensure she would be subjected to his remarks.

Elkon was not a passive observer, either. She intervened but did not call out Knapp's remarks. Ex. G, AWS_Wheeler 000193-200. Rather, she was concerned about a potential late product, writing: "We actually connected with Rafael this morning." *Id.* On one hand, Elkon was concerned enough to attempt to remediate any issues concerning Defendant's legitimate business, yet on the other, she had no care in the world about Knapp's explicitly racist comment. A reasonable fact finder could infer that

Elkon endorsed Knapp's comment.

Defendant seeks to brush all of Knapp's race-based and age-based comments under the table, arguing they are irrelevant "stray remarks. MSJ at 15-17. But it barrels through the warning signs that the 5th Circuit has repeatedly posted concerning the "messy" doctrine. *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 229 (5th Cir. 2000). In *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015), the court "again emphasize[d] the two different contexts" in which stray remarks are analyzed. As direct evidence, a more demanding standard is applied: racist or ageist remarks "defeat summary judgment—*that is to serve as sufficient evidence that by itself would allow a jury to find discriminatory motive*—only if they are not stray, but instead are tied to the adverse employment action at issue both in terms of when and by whom they were made." *Id.* at 475 (emphasis supplied). As circumstantial evidence, in contrast—when "the discriminatory remarks are just one ingredient in the overall evidentiary mix"—a more flexible standard is applied. *Id.* Under the flexible standard: "[t]he comments must show: '(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person with influence or leverage over the relevant decisionmaker.'" *Id.* at 475-76 (5th Cir. 2015).

Here, Plaintiff is not relying on Knapp's racist and ageist remarks, alone, as direct evidence to prove discrimination, so the relaxed standard applies. *Id.* Knapp's "stereotypical Latin fire" comment, his scornful Portuguese salutations, and his remarks about older people being "stubborn" reflect race-based and age-based animus, on their face. Neither can it be disputed that Knapp either had primary responsibility over Plaintiff or "influence or leverage" over the other decision makers at issue. *Goudeau.*, 793 F.3d at 475; *See supra* Section I(A)(II). Accordingly, Plaintiff is entitled to use Knapp's comments as part of her collection of evidence to make out her *prima facie* disparate treatment claims.

Knapp's offensive age-based and race-based remarks, along with Elkon's endorsement of the race-based remark, simply cannot be disjoined from their day-to-day discriminatory mistreatment of

Plaintiff. Knapp engaged in other inappropriate workplace conduct, such as sharing images of himself giving the middle finger to the camera, Ex. DD, AWS_Wheeler 000451, sharing off color jokes, *id.;* stalking social media to announce his subordinates' birthdays without their consent, including on one occasion when he announced the birthday of Plaintiff and used a picture of a hen, which a reasonable juror could infer was a thinly veiled pejorative swipe at Plaintiff, the oldest member of the team, being an "old hen." *Id.* 63:22-64:15. Knapp was "incredibly dismissive in meetings," Ex. A, Wheeler Dep. 154-56; refused to respond to Plaintiff, *Id.*; fielded questions from her coworkers and asked them to present information but ignored Plaintiff. *Id.* at 154:21-156:1. Elkon followed Knapp's lead. Not only did she effectively endorse (and fail to report) Knapp's racist comments, but she was "really horrible" to Plaintiff, *Id.* 157:3-4; she would intentionally try to embarrass Plaintiff; would excessively scrutinize her work, *Id.* 157:18-25; would be harsh to Plaintiff on group calls, *Id;* and acted aggressively towards Plaintiff. Ex. BB, AWS_Wheeler 000421-39. Plaintiff also observed Elkon making disparaging remarks about and insulting other people's attire and making remarks concerning her belief that one of Plaintiff's coworkers lacked intelligence. *Id.* 56:21-58:2; 58:14-59:6; 60:3-61:15.

Taken together, Knapp's and Elkon's conduct towards Plaintiff informs their decision-making concerning the adverse actions at issue. Further, Knapp's and Elkon's mistreatment towards Plaintiff was not isolated to her. Plaintiff witnessed Knapp mistreat her Hispanic colleague, Visconti. Ex. Q, AWS_Wheeler 000285-93, and observed Elkon endorse Knapp's behavior. This is probative me-too evidence from which a reasonable juror could infer that Plaintiff, too, was similarly treated worse because of her protected classes. *See Sprint/United Mgmt. Co.,* 552 U.S. at 388.

Finally, Plaintiff's comparative evidence further supports her discrimination claims. Plaintiff was the oldest employee on her team and one of just two Hispanic employees.  Ex. PP, Wheeler Decl. ¶9. Plaintiff was older than both Knapp and Elkon, both of whom are Caucasian. Elkon's evidence shows Elkon treated Plaintiff worse than her colleagues outside of her protected class. Plaintiff's

performance was as good, or better than her similarly situation team members. However, Patrica would leave Plaintiff off of team communications, and would dismiss her ideas in group meetings; cut her off while she was speaking; while allowing Plaintiff's younger peers an open platform to share their thoughts and ideas. Ex. PP, Wheeler Decl.   ¶9.   Patricia Elkon held one on one meetings with the younger employees who worked on the "HR4HR Review Doc", to provide them with feedback, but she publicly attempted to shame me with her feedback in a group email with those same younger employees. Ex. PP, Wheeler Decl.  ¶10, ¶11

Yet, it was Plaintiff who was denied an opportunity to transfer internally, was on a Pivot; and was ultimately terminated. Ex. PP, Wheeler Decl. at 14. Indeed, Defendant replaced Plaintiff with a younger employee, outside of Plaintiff's protected age class. Ex. OO, AWS_Wheeler 001176-79. Although Defendant's replacement identifies as Hispanic/Latino, this does not change the ultimate question of whether Defendant discriminated against on the basis of her race/national origin. *See Rutherford v. Harris County Texas*, 197 F.3d 173 (5th Cir. 1999).[14]

A reasonable jury could find that Defendant discriminated against Plaintiff based on her evidence of Knapp's racist and ageist comments, Elkon's endorsement of the same, Knapp's and Elkon's history of mistreatment of other older Hispanic employees and their more favorable treatment of younger Caucasian employees. *Thornbrough,* 760 F.2d at 643-44 ("They exude that faint aroma of impropriety that is sufficient to justify requiring the Railroad to give reasons for its decision"). Viewed in its totality, Plaintiff's evidence raises genuine disputes of material fact as to whether Defendant discriminated against her on the basis of her race, national origin, and age. Defendant's Motion must be denied.

---

[14] Defendant does not dispute Plaintiff's and her younger Caucasian team members had the "same job or responsibilities, shared the same supervisor or had their employment status determined by the same person." *See Lee v. Kansas*, 574 F.3d 253, 260 (5th Cir. 2009). Rather, Defendant argues Plaintiff's team members are not similarly situated because they were not "placed in Focus for three consecutive years, received back-to-back Least Effective ratings, failed to accomplish the expectations articulated in the Pivot, and failed her Pivot appeal, yet was not terminated." MSJ at 10. These reasons are precisely the adverse actions at issue. In other words, Defendant's argument is Plaintiff is not similarly situated to her younger Caucasian colleagues because they were not also subjected to discrimination. Defendant's argument fails.

**B.      Defendant's Legitimate Non-Discriminatory Reason is Unworthy of Credence and Plaintiff Adduces Substantial Evidence of Pretext**

As discussed in detail in Section I(C), *supra*, substantial evidence calls into question the legitimacy of Defendant's explanation for its treatment of Plaintiff. Defendant's explanation is no more credible in the context of Plaintiff's disparate treatment claims than it is in the context of retaliation claims. On this basis, alone, the Court can deny Defendant's Motion.

Similarly, the same evidence of pretext within the context of Plaintiff's retaliation claims is applicable here. *Id.* As described above, on Plaintiff's evidence, a reasonable jury could easily determine that Defendant's assertion that Plaintiff's performance was the reason for the adverse actions is merely pretext for discrimination.

**C.      Motivating Factor**

Even if the Court finds that Defendant's explanation for the discrimination is valid, Plaintiff can still prevail on her Title VII race and national origin disparate treatment claims, as well as all of her TCHRA claims,[15] by showing discrimination was a motivating factor in the adverse actions at issue. *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 174 (2009). *Goudeau,* 793 F.3d at 475 ("The TCHRA requires a less demanding showing as a plaintiff can prove discrimination at the third stage by establishing that "either (1) the reason stated by the employer was a pretext for discrimination, or (2) the defendant's reason, while true, was only one reason for its conduct and discrimination is another motivating factor."). *Reed v. Neopost USA, Inc.,* 701 F.3d 434, 438-40 (5th Cir.2012). As discussed above, Plaintiff's evidence establishes that discrimination was the *but for* cause of the adverse actions at issue. Plaintiff invariably meets the lower " motivating factor" standard. Accordingly, even if the

---

[15] Defendant argues Plaintiff's TCHRA race discrimination claim is time barred because Plaintiff alleged race discrimination after 180 days. The allegations in Plaintiff's original charge are identical to her amended charge, and she alleges discrimination on the basis of her Hispanic heritage in each. Ex. KK; Ex. LL. The 5th Circuit has "held that an amendment, even one that alleges a new theory of recovery, can relate back to the date of the original charge when the facts supporting both the amendment and the original charge are essentially the same." *Manning v. Chevron Chemical Co., LLC*, 332 F.3d 874 (5th Cir. 2003). Plaintiff's facts are not "essentially the same," they are identical. *Id* ("If the amendments involve acts that 'relate[] to or grow[] out of the subject matter of the original charge,' the amendments will 'relate back to the date the charge was first received.') (quoting 29 C.F.R. § 1626.8(c)).

Court finds Defendant was also motivated by legitimate reasons, Defendant is nonetheless liable for the discrimination that motivated its employment decisions adverse to Plaintiff. *Gross*, 557 U.S. at 174; *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101 (2003).

## CONCLUSION

For the foregoing reasons, Defendant's Motion must be denied.

Respectfully submitted,

**THE VENTRESS FIRM, P.C.**

By: */s/ Lisa Ventress*
Lisa Ventress
Federal Bar No. 3471199
Texas Bar No. 24076751
1322 Space Park Dr. Ste. C222
Houston, TX 77058
TEL. (832)240-4365
lisa@theventressfirm.com

**ATTORNEY FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on the date indicated herein, I caused a copy of Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment, exhibits and proposed order to be served, via the Court's electronic case filing system, upon all counsel of record.

Dated: November 9, 2023

Morgan, Lewis & Bockius LLP
**Tyler J. Hill**
TX Bar No. 24130505
Federal ID No. 3815851
1717 Main Street, Ste. 3200
Dallas, TX 75201
T: 214.466.4160
 F: 214.466.4001
tyler.j.hill@morganlewis.com

**ATTORNEYS FOR DEFENDANT
AMAZON WEB SERVICES, INC.**

Morgan, Lewis & Bockius LLP
**Stefanie R. Moll** - *Attorney-in-charge*
TX Bar No. 24002870
Federal ID No. 22861
1000 Louisiana Street, Suite 4000
Houston, TX 77002
T: 713.890.5000
F: 713.890.5001
stefanie.moll@morganlewis.com

 */s/Lisa Ventress*
 Lisa Ventress